OPINION
{¶ 1} Appellant, Ernest L. Averiett, III ("Averiett"), challenges his convictions and sentences for felonious assault, kidnapping, intimidation of a witness, and failure to comply with the lawful order of a police officer. He argues that the convictions were against the manifest weight of the evidence, and that the sentences imposed upon him was unconstitutional in light of Blakely v. Washington.[1] In light of the decision of the Supreme Court of Ohio in State v. Foster, we affirm the convictions, reverse the sentencing order, and remand for resentencing.[2]
 {¶ 2} Averiett was indicted by the grand jury for six counts: one count of felonious assault, a violation of R.C. 2903.11(A)(1) and (D), and a felony of the second degree; two counts of rape, violations of R.C. 2907.02(A)(2) and (B), and felonies of the first degree; one count of kidnapping, a violation of R.C.2905.01(A)(2) and (C), and a felony of the first degree; one count of intimidation of a victim, a violation of R.C. 2921.04(B) and (D), and a felony of the third degree; and one count of failure to comply with an order or signal of a police officer, a violation of R.C. 2921.331(B) and (C)(1) and (5)(a)(ii), and a felony of the third degree. Averiett entered a not guilty plea to all counts.
 {¶ 3} The case proceeded to jury trial, the jury finding Averiett guilty on four of the counts, relating to felonious assault, kidnapping, intimidation of a victim, and failure to comply with an order of a police officer; and finding him not guilty on the two rape counts. On January 11, 2005, the trial court imposed the following sentences: eight years on the felonious assault conviction; ten years on the kidnapping conviction; five years on the intimidation of a victim conviction; and three years on the failure to comply with a police order conviction, all sentences to run consecutive to each other, for a total of twenty-six years. Averiett filed a timely appeal.
 {¶ 4} The following facts were testified to at trial.
 {¶ 5} Jonelle Wynn ("Wynn") was the girlfriend of Averiett. She testified that she and Averiett had a relationship for eleven months when, on August 16, 2004, Averiett assaulted her because he believed she was cheating on him. The assault consisted of numerous punches to her face and head, inserting a tire iron into her mouth, burning her chest, arms, legs, and abdomen with a hot iron, choking her, and kicking her in the head. In order to muffle her screaming, Averiett stuffed socks into her mouth. He digitally penetrated her vagina and anus to determine whether she had a recent sexual encounter. Averiett then pulled Wynn by her hair and dragged her into her bathroom. He forced her into the bathtub and ran water over her burned flesh. He then dragged her downstairs and demanded to know where she had put his money. Wynn tried to escape out the rear door of the kitchen, but Averiett grabbed her by the neck and restrained her from doing so. Wynn demanded to be taken to the hospital. Eventually, Averiett transported her to St. Elizabeth's Hospital in Youngstown, Ohio. Prior to entering the hospital emergency room, Averiett directed her to make up a story for the medical personnel. The story was that she had just been assaulted by unknown females in Youngstown, and they had injured her with a hot iron. She repeated that story to numerous medical personnel, until the eighth day after the incident, when she implicated Averiett in the assault.
 {¶ 6} Three days after she was released from the hospital, Averiett appeared at her residence and created a disturbance. When the Warren Police responded to the incident, Averiett fled from the police in a high-speed chase. Eventually, he was apprehended after he exited the automobile and attempted to flee on foot.
 {¶ 7} Averiett testified at trial. In his testimony, he denied that he was the perpetrator of the injuries to Wynn. Instead, he testified that he went to Wynn's apartment on August 16, 2004, to confront her about his discovery that a young female named "Lips," with whom they both had sex on the previous day, was only seventeen years of age. The fact that the girl was only seventeen years old upset him, because he was due to be released from post-release control on September 9, 2004, and the fact of having sex with an underage female might jeopardize his release and possibly send him back to prison. When he confronted Wynn, he observed that she was severely injured and burned. When he questioned Wynn about her injuries, she told him that Lips had burned her. It was at his insistence, according to Averiett, that he take her to the hospital for her injuries; and it was Wynn who concocted the story about being mugged by unknown females in Youngstown. Averiett stated that he was concerned about her injuries and stayed with her in the hospital for long periods of time, though during the hospital stay he did advise her that he was going to leave her and their relationship was finished.
 {¶ 8} Detectives Fusco and Merritt of the Warren Police Department investigated the crime scene. Detective Fusco took photographs of blood spatters on the kitchen door, the refrigerator, and the kitchen floor. Physical evidence consisting of bloody socks in the bedroom and bathroom, an iron, and a tire iron was collected and submitted to the Ohio Bureau of Criminal Investigation ("BCI") for analysis.
 {¶ 9} BCI Serologist Akbar testified that amylase, a component of saliva, and blood were present on the socks that she examined. In addition, her tests on blood samples taken from the kitchen floor and refrigerator were positive for human blood. Finally, she identified a blood spatter that was slightly larger than a nickel and "brown chunky material," consistent with human skin, on the iron that was submitted for analysis.
 {¶ 10} BCI Serologist Gerardi testified that she performed DNA testing on the socks and the iron. Wynn's DNA and Averiett's DNA were present on the socks and the temperature dial of the iron.
 {¶ 11} Averiett's first assignment of error is as follows:
 {¶ 12} "The trial court's imposition of maximum and consecutive sentences upon appellant based upon findings not made by a jury nor admitted by appellant is contrary to law and violates appellant's rights to a jury trial and due process, as guaranteed the Sixth and Fourteenth Amendments to the United States Constitution."
 {¶ 13} In this assignment of error, Averiett argues that it was error for the trial court to sentence him to maximum and consecutive sentences based upon findings not found by a jury nor admitted by him.
 {¶ 14} In light of the recent decision by the Supreme Court of Ohio in State v. Foster, we find merit in this assignment of error. Paragraph one of the syllabus of State v. Foster holds that judicial factfinding supporting the "imposition of a sentence greater than the maximum term authorized by a jury verdict or admission of the defendant" is unconstitutional;[3] and paragraph three of the syllabus in that case holds that it is unconstitutional for a trial court to engage in "judicial finding of facts not proven to a jury beyond a reasonable doubt or admitted by the defendant" in order to impose consecutive sentences.[4]
 {¶ 15} This matter will be remanded to the trial court for resentencing.
 {¶ 16} Further, we find that this assignment of error challenges all sentences imposed upon Averiett, including the sentence of three years for failure to comply with an order or signal of a police officer. Even though the trial court did not impose the statutory maximum of five years for this offense, we read the word "maximum" in the assignment of error to include not only the statutory maximum, in this case five years, but also "`the maximum [sentence a trial court] may impose without any additional findings,'" which in this case would be one year.[5] Thus, Averiett is to be resentenced with respect to all offenses for which he was convicted.
 {¶ 17} The first assignment of error has merit.
 {¶ 18} In his second assignment of error, Averiett asserts that "[t]he appellant's convictions are against the manifest weight of the evidence."
 {¶ 19} Averiett argues that he was "falsely accused" by Wynn and that "Wynn's story changed frequently." He, therefore, puts Wynn's credibility in issue to support his manifest weight argument. Credibility is certainly one of the things to be considered by the jury in resolving evidentiary conflicts. As stated by the Supreme Court of Ohio, "the weight to be given to the evidence and the credibility of the witnesses are primarily for the trier of the facts."[6]
 {¶ 20} With respect to appellate review of a manifest weight argument, that same court has provided the following guidance to appellate courts:
 {¶ 21} "`The court, reviewing the entire record, weighs the evidence and all the reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'"[7]
 {¶ 22} Thus, the jury, as well as this court when we conduct a manifest weight analysis, must weigh the credibility of the witnesses. In fact, this court sits as a "`"thirteenth juror"'" during such an exercise and is guided by:
 {¶ 23} "`[T]he inclination of the greater amount of credibleevidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducingbelief.'"[8]
 {¶ 24} We conclude that the greater amount of credible evidence came from the state's case-in-chief. The jury heard Wynn testify that Averiett entered her bedroom in an enraged state. He was upset and accused her of cheating on him. He committed numerous acts of violence upon her. He demanded to check her orifices to determine for himself whether she had been cheating. In addition to striking her with his fists, he used two other instruments, to wit: a tire iron and a hot iron, to inflict injury upon her. He grabbed her by her hair and forced her into the bathtub and, then, down into the kitchen, where he choked her when she tried to escape out the kitchen door.
 {¶ 25} The doctor who treated Wynn at the emergency room in Youngstown identified fifteen to twenty different places on her body where she was burned by a hot iron. He also identified trauma to her face and neck. The Warren Police Detectives investigated Wynn's residence and located blood spatters where Wynn told them they would be. The BCI technicians testified concerning blood and saliva on the socks Wynn said were stuffed in her mouth and concluded they were traceable to Wynn. They also found DNA evidence on those objects and on the temperature dial of the iron, which was traceable to Averiett. A neighbor, Beneeta Miller, put Averiett at the scene of Wynn's residence at the date and time in question, though she was too distant to observe any injuries to Wynn.
 {¶ 26} Though Wynn clung to the story provided to her by Averiett regarding the females in Youngstown, eventually she told two nurses in the hospital in Akron that Averiett was the perpetrator of her injuries.
 {¶ 27} The jury also heard Averiett's version of the events occurring on August 16, 2004. He admitted to being a convicted felon and to serving approximately ten years in prison over various periods of time for receiving stolen property, attempted robbery, failure to comply, and drug abuse. He admitted to committing domestic violence upon Wynn and blackening both of her eyes in one incident. He described himself as a "hustler" and one who supports himself by committing crimes: "I specialize in [stolen] cars, real drugs, fake drugs." He admitted to being in Wynn's residence on at least three separate occasions on the day in question, going in and out of her residence to sell drugs. According to Averiett, he was bothered by the fact that Wynn had arranged three-way sex the night before with an underage female, a fact that might have jeopardized his release from post-release control. That is why he confronted her in her apartment and, when he did so, according to Averiett, he observed the burn injuries and other injuries to Wynn, and that is when Wynn told him that the injuries were committed by the underage female. Instead of taking her to the hospital right away, he questioned her about money and drugs that he had stored at her apartment. Averiett also testified that Wynn was in a drug-induced stupor from consuming illegal drugs and/or abusing prescription drugs. Averiett admitted to taking almost three hours to get Wynn to the hospital, a trip of less than one-half hour, and attributes the delay to stopping to buy cigarettes and convincing Wynn that she needed medical treatment. When he visited Wynn in the hospital in Akron, she knew that he carried a barbecue pitchfork on his person. According to Wynn, he threatened to use the pitchfork on her if she ever accused him of the crimes committed upon her, though according to Averiett, he simply carried it for his own protection. When Wynn finally did implicate him in the crimes, Averiett attributes that to the fact that he told her on the sixth day she was in the hospital that he was going to leave her. When asked why he did not call the police when he observed Wynn's injuries, he said that he would never call the police, that he was "allergic" to the police, because whenever the police responded to an incident in which he was involved, he would get locked up. Three days after Wynn was released from the hospital, Averiett went to Wynn's apartment to get his clothes and cologne, but by then the locks had been changed. The police were called for a disturbance, and a high-speed chase ensued in which Averiett was eventually captured.
 {¶ 28} Even apart from Averiett's criminal background and lifestyle, which by themselves make him less than a credible witness, his version of the events is not believable. The underage female named "Lips" did not come forward to testify, and Wynn's denial that she even knew such a person makes it just as likely that "Lips" was a fabrication by Averiett. Further, the evidence of saliva and DNA in Wynn's apartment were identified as belonging to Wynn and Averiett, and to no one else. Supposedly, Lips was a normal-sized person weighing about one hundred fifty pounds, while Wynn was large in stature. The likelihood of a female smaller in stature than Wynn inflicting the egregious injuries on Wynn is not plausible. The jury was permitted to believe that Wynn's version of the events was more plausible, and its verdict reflects as much.
 {¶ 29} Moreover, when Averiett posits that the reason Wynn pointed to him as the perpetrator was because he was ending their relationship, he asks the jury to believe Wynn accused him only because he jilted her as a lover. He does not consider that if the jury were to believe his argument, it would also have to believe that Wynn accused him, instead of the unknown female named "Lips," in order to get revenge, all the while letting the unknown female go free after committing horrendous crimes against her. Averiett's argument stretches credibility beyond the breaking point, and the jury did not accept his version of events. Averiett's previous history of committing domestic violence upon Wynn, his large physical stature and strength as compared with Wynn, and his intimidating presence in the hospital, with his ever-present pitchfork on his person, explain why it took eight days before Wynn finally implicated Averiett for the crimes. The jury did not lose its way when it convicted him for felonious assault, kidnapping, intimidation of a victim, and failure to comply.
 {¶ 30} The second assignment of error is without merit.
 {¶ 31} The judgment of the trial court convicting Averiett of offenses charged under Counts 1, 2, 3, and 6 of the indictment is affirmed. However, this matter is remanded to the trial court for resentencing consistent with this opinion.
Ford, P.J., concurs, V. Grendell, J., concurs in judgment only.
[1] Blakely v. Washington (2004), 542 U.S. 296.
[2] State v. Foster, ___ Ohio St.3d ___, 2006-Ohio-856.
[3] State v. Foster, supra, paragraph one of the syllabus.
[4] Id. at paragraph three of the syllabus.
[5] (Emphasis in original.) State v. Foster, supra, at ¶ 7, quoting Blakely v. Washington, 542 U.S. at 303-304.
[6] State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
[7] (Citation omitted.) State v. Thompkins (1997),78 Ohio St.3d 380, 387.
[8] (Emphasis added by Supreme Court of Ohio.) Id., quoting Black's Law Dictionary (6 Ed. 1990) 1594.